**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Kraig A. Stengrim,

                              Plaintiff,           Civ. No. 04-3192 (RHK/RLE)
                                                    **MEMORANDUM OPINION
                                                      AND ORDER**

v.

The Northwestern Mutual
Life Insurance Company,

                              Defendant.

Robert O. Blatti, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, Minnesota, for Plaintiff.

Erik T. Salveson, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, for Defendant.

**Introduction**

      Plaintiff Kraig Stengrim brought suit against Defendant Northwestern Mutual Life Insurance Company ("Northwestern Mutual") seeking payments of benefits under his disability insurance policy. Northwestern Mutual now moves for summary judgment arguing that it was entitled to rescind Stengrim's policy because he made material fraudulent misstatements on his policy application and that he is not totally disabled under the policy. For the reasons set forth below, the Court will deny the Motion.

**Background**

In May 2000, Stengrim purchased a disability insurance policy from Northwestern Mutual ("the Policy"). (Salveson Aff. Ex. D-5.) Prior to purchasing the Policy, Laura Eidsvold, a Northwestern Mutual insurance agent, completed the Policy application with Stengrim.[1] (Id.) Eidsvold asked Stengrim each of the questions on the application, and noted Stengrim's responses on the application. Stengrim's wife, Kristi Stengrim, was present when Eidsvold administered the application questions to Stengrim.

The following questions were contained on the application with boxes to mark either "yes" or "no" and with a space to provide certain information ("Details") if "yes" were marked:

> 33. In the last 10 years, have you had, been told you had or been treated for: . . . c. Anxiety, depression, stress, or any psychological or emotional condition or disorder?" (Salveson Aff. Ex. D-5, question 33(c).)
>
> "No" is marked next to this question. (Id.)
>
> 34.c. In the last 10 years, have you used any tranquilizers, sedatives or narcotic drugs?" (Id. question 34(c).)
>
> "No" is marked next to this question. (Id.)
>
> 36. Other than as previously stated on this application, in the last five years have you: a. Consulted any other health care providers (medical doctor, <u>psychiatrist</u>, psychologist, chiropractor, counselor, therapist or other)? (Id. (emphasis added).)

---

[1] Stengrim and his wife, Kristi Stengrim, were personal friends with Eidsvold prior to their contact with her in connection with the Policy; Kristi Stengrim and Eidsvold remain close personal friends.

"Yes" is marked next to this question; the "Details" section contains a notation indicating that Stengrim was referring to "chiropractor occasional adjustment."[2] (Id.)

38. Do you have a family history of diabetes, cancer, melanoma, heart or kidney disease, <u>mental illness or suicide</u>, or any hereditary disease?" (Id. question 38(a) (emphasis added).)

"No" was marked next to this question. (Id.)

On May 22, 2000, Stengrim signed the application. Directly above Stengrim's signature, the application stated: "I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief." (Id.)

There is no dispute that the answers to the above specified questions on the application were incorrect and/or incomplete. For example, Stengrim testified as follows regarding question 33.c.:

> Q: And "no" is checked on your behalf to question 33.c.; correct?
> A: Yes.
> Q: And "no" is an incorrect answer to that question, true?
> A: Yes, I would say that's true.

(Stengrim Dep. at 139-140; <u>see also</u> <u>id.</u> at 153-54 (regarding question 36.a.); <u>id.</u> at 164-65 (regarding question 38.a.).)

---

[2]Stengrim's answer to question 36.a. is consistent with his answer to a similar question he was asked pursuant to a "Personal History Interview," which was conducted on June 1, 2000. (Salveson Aff. Ex. D-6.) The Personal History Interview asked "Within the past 5 years, have you consulted any other health care providers or physician specialists such as chiropractors, psychologists, <u>psychiatrists</u>, counselors, or therapists?" (Id. question 8 (emphasis added).) Stengrim answered "no" to this question. (Id.)

3

On March 31, 1998, prior to purchasing the Policy, Stengrim sought mental health treatment with Dennis Nims, a licensed social worker in Fergus Falls. (Salveson Aff. Ex. D-2.) On April 22, 1998, Stengrim met with Dr. Traiser, a psychiatrist, who diagnosed Stengrim with Dysthymia, a type of depression, and prescribed Prozac. (Id.) Stengrim met with Dr. Traiser four more times from May 1998 to January 1999. (Id.) Stengrim estimated that he stopped taking Prozac around April 1999. (Id.) Stengrim's mother, aunt, and sister have suffered from depression. His mother attempted suicide 20 to 30 years ago. (Stengrim Dep. Tr. at 162.) His aunt also suffered from schizophrenia. (Id.)

According to Stengrim, he answered Eidsvold's questions truthfully and accurately when completing the application. (Stengrim Dep. Tr. at 142.) He does not remember specifically answering "yes" to question 33.c., but states that "if [Eidsvold] asked [him] the question [he] answered it honestly and whatever got marked down got marked down." (Id. at 141-42; see also id. at 141 ("I'm just saying I may or may not have said yes or no, but it didn't get checked correctly.")  Nor does he remember whether Eidsvold asked him for details regarding his "yes" answer to question 36.a., though there are notes in the Details section addressing previous treatment he received from his chiropractor. (Id. at 156.)

In September 2002, a glass beer bottle exploded injuring Stengrim's right eye. (Blatti Aff. Ex. E.) On September 21, 2002, he submitted an application for disability benefits under the Policy. (Id.) His claim was approved and, in January 2003, he began receiving monthly benefits payments under the Policy. (Id.)

4

In early November 2003, after learning of Stengrim's mental health history and treatment, Northwestern Mutual notified Stengrim by letter that a review of his medical records revealed that he had provided the company with inaccurate or incomplete medical history information during the Policy application process. (Salveson Aff. Ex. D-12.) The letter stated that this information would have made a difference in its underwriting decision. (Id.) Northwestern Mutual also stated that it intended to rescind the Policy, but gave Stengrim the opportunity to present "any additional information [he] would like [Northwestern Mutual] to consider" by November 26, 2003. (Id.) On December 4, 2003, having received no satisfactory response from Stengrim, Northwestern Mutual returned all of the premiums Stengrim had paid, and rescinded the Policy. (Id. Ex. D-13.) This action followed.

In his Complaint, Stengrim claims that Northwestern Mutual "is obligated to the terms of the . . . Policy . . . to pay to [him] . . . all benefits payable under [the Policy] from September 8, 2002, to date . . . ." (Compl. ¶ 8.) He seeks a determination that he is totally or partially disabled under the terms of the Policy, and "judgment against [Northwestern Mutual] for all benefits due and payable under [the Policy]." (Compl. at 2.)

**Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**Analysis**

Northwestern Mutual contends that it was entitled to rescind the Policy due to Stengrim's inaccurate answers to questions on the Policy application regarding his history of mental health issues, the treatment he received from a psychiatrist, and his family history with mental illness. (Mem. in Supp. at 6-18.) It also argues that Stengrim "is not totally disabled within the plain meaning of the . . . policy." (Id. at 21.) With respect to Northwestern Mutual's rescission of the Policy, Stengrim responds that summary judgment is not appropriate because Northwestern Mutual has not established that Stengrim engaged in a "fraudulent misrepresentation" by withholding information, or that the inclusion of such information "would have impacted the underwriting of [the] policy." (Mem. in Opp'n

at 12-18.) He further argues that genuine issues of material fact exist as to whether he is totally disabled under the Policy. (Id. at 19-23.)

**A.    Northwestern Mutual's Decision to Rescind the Policy**

The Policy provides that:

> [i]n issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, <u>after this policy has been in force for two years from the Date of Issue, no misstatement, except a fraudulent misstatement, in the application may be used to rescind the policy</u> or to deny a claim for a loss incurred or a disability commencing after the two-year period.

(Salveson Aff. Ex. D-5 (emphasis added).) There is no dispute that this provision of the Policy comports with Minn. Stat. §§ 62A.04, subd. 2(2)[3] and 62A.06, subd. 3[4], which govern disability insurance contracts. See also Adzick v. Unum Life Ins. Co. of America, 351 F.3d 883, 886 (8th Cir. 2003) ("Minnesota courts recognize that Minnesota Statutes § 62A governs disability insurance." (footnote and citation omitted)).

---

[3]Minn. Stat. § 62A.04, subd. 2(2) provides in relevant part:

TIME LIMIT ON CERTAIN DEFENSES: (a) After two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two year period.

[4]Minn. Stat. § 62A.06, subd. 3 provides in relevant part:

The falsity of any statement in the application for any policy . . . may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.

Under Minnesota law, if a policy is more than two years old, as the instant Policy is, an insurer "has the option to void an insurance contract once it discovers that [1] the insured has willfully made a false representation [2] which is material and which increases the contractual risk undertaken by the insurer." Howard v. Aid Ass'n for Lutherans, 272 N.W.2d 910, 912 (Minn. 1978) (citations omitted); see also Adzick, 351 F.3d at 886 (noting that "[b]ecause [the plaintiff's] policy is more than two years old, [the insurer] must also prove fraud in addition to materiality" (citations omitted)). In the instant case, Stengrim challenges Northwestern Mutual's showing with respect to both requirements. The Court will consider each of Stengrim's arguments in turn.

### 1. Fraudulent Misstatements

Stengrim argues that summary judgment is not appropriate on the issue of whether or not he made fraudulent misstatements on his application. He urges that "more than the failure of an insured to report material information on an insurance application will be required before fraudulent misrepresentation is found," and that, based on this standard, there are genuine issues of material fact as to whether he was attempting to deceive Northwestern Mutual in answering the application questions. (Mem. in Opp'n at 16.)

The Eighth Circuit has determined that under Minnesota law, "[w]here the insured had full knowledge of the concealed facts, an inference that the insured was willfully false or intentionally misleading arises as a matter of law." Adzick, 351 F.3d at 886 (citation omitted). Minnesota law "does not require that there be an intent to deceive. All that is required is that the insured have full knowledge of the facts that are concealed . . . ." Ellis v.

8

Great-West Life Assurance Co., 43 F.3d 382, 387 (8th Cir. 1994) (emphasis in original) (analysis under Minn. Stat. § 61A.11). This is especially true where the information is withheld by the insured "in response to specific questions on the application." Id. (emphasis added); see also LeBus v. Northwestern Mut. Life Ins. Co., 55 F.3d 1374, 1377 (8th Cir. 1995) ("Whether it is necessary to demonstrate a subjective intent to deceive depends greatly upon the specificity and nature of the questions asked in the insurance application.").

Stengrim's argument that Northwestern Mutual must prove he was acting with a "premeditated design" to falsify facts in omitting information regarding his mental health history fails under Minnesota law. As support for his argument, he cites Adzick, which stated

> '[a] willfully false and intentionally misleading answer is one which is consciously made with a premeditated design so as to falsify facts so as to lead the insurer to act when he otherwise would not' and '[w]illfully false denotes knowingly concealed.'

351 F.3d at 886-87 (quoting Siemers v. United Benefit Life Ins. Co., 75 N.W.2d 605, 608 (1956)). Adzick did not, however, rely on this definition in its analysis, or discuss the recognized exceptions to that definition. The Eighth Circuit previously considered the above quoted language (from Siemers), and noted that "[i]n later Minnesota appellate decisions where the questions on the insurance application have been more specific than in Siemers, Minnesota courts have not required a 'premeditated design' to falsify facts." Ellis, 43 F.3d at 386 (citations omitted); see also LeBus, 55 F.3d at 1377 (noting that the

9

court has "observed . . . that the Minnesota courts do not always require proof of a subjective 'premeditated design'" (citing Ellis)).

Here, Stengrim was asked specific questions regarding whether he had been treated for depression, consulted a psychiatrist, or had a family history of mental illness or suicide. (See Salveson Aff. Ex. D-5.)  There is no dispute that Stengrim knew that the full, complete, and correct answers to these questions would have included reference to his history of depression and his consultation with a psychiatrist. (Mem. in Opp'n at 16 ("It is impossible to argue that [Stengrim] did not have knowledge of, or at least should not have known, of his brief period of mental health treatment when he completed the application for the [Policy].").)  Accordingly, this Court determines that Northwestern Mutual need not show that Stengrim acted with an intent to deceive.

According to Stengrim, however, "this alone does not answer the question of why this information does not appear on the application." (Id.)  Stengrim points to a number of facts which he contends create triable issues of fact on the question of whether he actually answered the relevant questions on the application without reference to his history of depression. (Id. at 16-18.)

First, he highlights that Eidsvold "was the only one that had an application in front of her when she interviewed [Stengrim]," and that she "has no recollection of how she asked each question." (Id. at 16-17.) Eidsvold's testimony, however, belies any inferences Stengrim attempts to raise by her isolated testimony to the effect that she cannot remember

every question that she asked Stengrim in the application process.[5] Eidsvold clearly testified that, with respect to all of the applications she has completed for Northwestern Mutual, it was her practice to read all of the questions in the application to the prospective insured. (Eidsvold Dep. Tr. at 101-102.) She also testified that she would write down the applicant's answers as they were given, that she exercised care in doing so, and that she had no reason to think that she did not follow her general practice with Stengrim. (Id. at 101-103.) Eidsvold was specifically asked about the questions relevant to this action and she testified that, given her general practice, she would have read those questions verbatim to Stengrim; if, in response to any of those questions, Stengrim had provided a "yes" answer, she would have asked him for details and recorded that information as well. (See id. at 111-19.) Therefore, the Court determines that Stengrim's attempt to raise an inference that Eidsvold did not read the relevant questions to him has no merit.

Second, Stengrim points out that his application was one of Eidsvold's first, that she was nervous when filling it out, and that she made two mistakes on the application (which she corrected and had Stengrim initial).[6] Stengrim attributes these mistakes on the part of Eidsvold to her knowledge of the Stengrims as friends, and asks "[i]s it possible that Ms.

---

[5]Eidsvold testified that she has taken "500 or more" applications for disability or other insurance in the five years since she administered the application to Stengrim, and that she could not possibly remember each and every one of those application processing events. (Eidsvold Dep. Tr. at 101.)

[6]Eidsvold wrote an incorrect street name for Stengrim's home address, then crossed out the incorrect name, and wrote the correct one. (See Salveson Aff. Ex. D-5.) She also wrote that Stengrim's driver's license was issued in North Dakota, although it was actually issued in Minnesota. That mistake was corrected as well. (Id.)

Eidsvold made certain other assumptions from her past and current knowledge of [Stengrim] and his wife, such as an assumption that the Plaintiff did not have a history of mental health concerns?" (Mem. in Opp'n at 17.) Again, Stengrim's attempt to raise a triable issue of fact fails. There is no testimony whatsoever to suggest that Eidsvold skipped all of the relevant questions in favor of assumptions she held regarding Stengrim.[7] The fact that she corrected her errors regarding Stengrim's street address and driver's license, and had Stengrim initial those changes, demonstrates that she was conscientious and detailed in her completion of his application. Stengrim's conclusory conjecturing that a given question "probably was truthfully answered, but it just didn't get checked correctly," (Stengrim Dep. Tr. at 140-41), where he has no specific recollection of answering that question, does not satisfy his burden to raise a triable issue of fact.[8]

Finally, Stengrim argues that the fact his wife, Kristi Stengrim, was "present during [Stengrim's] entire application interview . . . and that she did not recall having to correct any of the information that [Stengrim] provided . . . during the interview" is "compelling"

---

[7] In fact, at one point, Stengrim testified that he was "sure [Eidsvold] asked me all these questions and I gave her answers, but I would have to read each one to say, yeah, I recall that one." (Stengrim Dep. Tr. at 137.)

[8] Stengrim also testified to the following:

Q: [Y]ou don't have any reason to think that Ms. Eidsvold would be inaccurate in recording the information you gave her, do you?
A: No.
Q: She's a trustworthy person, isn't she?
A: Yes.

(Stengrim Dep. Tr. at 138.)

12

evidence that Stengrim did not make any misrepresentations on his application. (Mem. in Opp'n at 18.) But Kristi Stengrim testified that Eidsvold asked the questions at issue in this lawsuit, that Eidsvold is an honest person, and that, based on her knowledge of Eidsvold, she would expect Eidsvold to truthfully write down any answers Stengrim gave on the application. (Kristi Stengrim Dep. Tr. at 48-49.) With respect to question 33.c., which asked whether Stengrim had been treated for any psychological condition in the past 10 years, Kristi Stengrim testified "[y]ou know I'm not exactly sure what happened there." (Id. at 44.) With respect to question 36.a., which asked whether Stengrim had consulted a psychiatrist in the past 5 years, she testified "[a]nd may be that [Stengrim] wasn't comfortable in saying something in front of a friend, I don't know." (Id. at 48.) This testimony on the part of Kristi Stengrim does not raise a triable issue of fact as to whether Stengrim's answers to the application questions were accurately or truthfully recorded by Eidsvold.

The Court's conclusion is bolstered by the fact that Stengrim's failure to acknowledge his mental health history extends to at least three separate questions on the application.[9] Furthermore, Stengrim signed the policy application, thereby declaring "that [his] answers and statements are correctly recorded, complete and true to the best of [his]

---

[9]This conclusion is further supported by the consistency between the answers Stengrim provided in completing the application, and those he provided to an underwriter at Northwestern Mutual in the Personal History Interview. (Salveson Aff. Ex. D-6.) On the Personal History Interview, Stengrim responded "no" to the question: "[w]ithin the past 5 years, have you consulted any other health care providers or physician specialists such as . . . psychiatrists . . . ?" (Id. question 8.)

13

knowledge and belief." (Salveson Aff. Ex. D-5.) Accordingly, the Court determines that there are no material issues of fact regarding whether Stengrim withheld information about his mental health history on the Policy application.

### 2. Materiality of the Misstatements

For Northwestern Mutual to prevail on its Motion, however, it must also establish that the misstatements were material; that is, "this fact, had it been disclosed, would have influenced [the insurance company's] decision to provide coverage." Berthiaume v. Minnesota Mut. Life Ins. Co., 388 N.W.2d 15, 19 (Minn. Ct. App. 1986). Under Minn. Stat. 62A.06, subd. 3, Northwestern Mutual must show that "the falsity of [the] statement in the application for any policy . . . materially affected either the acceptance of the risk or the hazard assumed by [it]." (Emphasis added). On this question of materiality, "the focal examination must be whether an omission or misrepresentation substantially affects or impairs an insurer's ability to make a reasonable decision to assume the risk of coverage." Howard v. Aid Ass'n for Lutherans, 272 N.W.2d 910, 912-13 (Minn. 1978).

The Minnesota Supreme Court has stated that "[e]xcept in rare instances, [the court] prefer[s] leaving it to the jury to determine the severity of the ailment and its effect upon the acceptance of the risk." Waite v. American Family Mut. Ins. Co., 352 N.W.2d 19, 21 (Minn. 1984) (internal quotation omitted). Even where there is no fact question as to whether an application contains false statements, "the fundamental question of the materiality of the false statement remains." Meyer v. Blue Cross and Blue Shield, 500

N.W.2d 150, 153 (Minn. Ct. App. 1993).  And "materiality is a fact question based on the objective facts of the particular case."  Id.

Northwestern Mutual submitted the affidavit of Steven Kien, a Standards/Compliance Research Consultant at Northwestern Mutual, in support of its position that Stengrim's misrepresentations on his application were material.  Kien was instructed to "review [Stengrim's] medical history in its entirety and provide [his] comments whether [the Policy] would have been issued, as applied for, had this history been disclosed at the time of the application."  (Kien Aff. Ex. E.)  Kien concluded that

> Mr. Stengrim's history of mental illness and resultant treatment increased the risk of a disability income policy and therefore would have been material under Northwestern Mutual's underwriting standards.  Northwestern Mutual would not have issued [the Policy] to Mr. Stengrim, as written, had he fully and truthfully disclosed his mental health history and treatment in the application and/or personal history interview.

(Kien Aff. ¶ 4.)

Kien does not, however, explain how he reached his conclusion that Stengrim's mental heath history would have been "material under Northwestern Mutual's underwriting standards."  Rather, Kien attached to his affidavit a similarly conclusory (three paragraphs in length) September 2003 internal memorandum, which he prepared for Northwestern Mutual, regarding the effect Stengrim's disclosure of his mental health history would have had on the issuance of the Policy.[10]  (Id. Ex. F.)  Further, as Stengrim points out, it is

---

[10]Kien also attached "Northwestern Mutual's underwriting standards for depression and depressive disorders," to his affidavit (Kien Aff. ¶ 5, Ex. F), although he does not adequately explain how he used those standards in arriving at his conclusions.

15

unclear how much of Stengrim's mental health treatment and history was either considered by Kien, or relevant to Kien's determination of the materiality of such information under Northwestern Mutual's policies.  (Mem. in Opp'n at 13.)

Simply put, Kien's submission to the Court is too conclusory to establish materiality as a matter of law given the fact intensive nature of the inquiry.  See Waite, 352 N.W.2d at 22 (discussing materiality, and noting that "[a] jury is not required to accept even uncontradicted testimony if improbable or if surrounding facts and circumstances afford reasonable grounds for doubting its credibility"); Meyer, 500 N.W.2d at 153.  It is Northwestern Mutual's burden to prove that Stengrim's misrepresentations "materially affected either the acceptance of the risk or the hazard [it] assumed," Minn. Stat. § 62A.06(3); Adzick, 351 F.3d at 886, and the Court determines that Northwestern Mutual has not met its burden in the instant action.  Accordingly, because triable issues of fact exist as to whether Stengrim's misrepresentations were material, the Court will deny Northwestern Mutual's Motion with respect to the rescission of the Policy.

**B.     Total Disability under the Policy**

In addition to arguing that it was justified in rescinding the Policy, Northwestern Mutual argues that Stengrim was not totally disabled within the plain meaning of the Policy. It contends that before his injury, Stengrim's principal duties consisted of "accounting, sales office equipment, equipment service and repair, counter sales and production," and that he has been able to do much of that work since his injury.  (Mem. in Supp. at 20.) Stengrim responds that his principal duties consisted only of "repairing and servicing

16

copiers and office equipment," and he has been unable to perform this work since his injury. (Mem. in Opp'n at 20.)

> The Policy defines "Total Disability" as follows:
>
> Until the end of the Initial Period, the Insured is totally disabled when unable to perform the principal duties of the regular occupation. After the Initial Period, the Insured is totally disabled when both unable to perform the principal duties of the regular occupation and not gainfully employed in any occupation.
>
> If the insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the insured may qualify as partially disabled.

(Salveson Aff. Ex. D-5.) The Eighth Circuit has considered this definition of total disability, and determined that it requires the insured to show that he is "unable to perform all principal duties of his regular occupation." Miller v. Northwestern Mut. Life Ins. Co., 392 F.3d 973, 977 (8th Cir. 2004); see also McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002) (policy required insured to show that "he . . . was unable to perform any of [the] important duties" of his occupation).

At the time of the injury to Stengrim's eye, he and his business partner co-owned a copy company, Copyworx and Design, Inc. On his September 2002 application for disability benefits under the Policy, Stengrim described his occupation as a "copier service technician to service office equipment." (Blatti Aff. Ex. E.) He stated that 95% of his time was spent as a "copier service technician," and 5% of his time was spent in "administration." (Id.) In the benefits application process, Stengrim reported that "[b]ecause he has no depth perception and has blurry vision, he is unable to perform repair

17

and service work on printers, copy and fax machines." (Id.)  In January 2003, Northwestern Mutual approved Stengrim for total disability benefits.  (Id.)

In McOsker, the Eighth Circuit found it significant that the insurance company initially determined the insured was totally disabled because he could not perform "any of a list of important duties that [the insured] had provided to the doctor."  279 F.3d at 589.  The court noted that it was

> not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, <u>the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.</u>

Id. (emphasis added).  The court rejected the insurer's efforts to redefine the important duties of the insured's occupation in order to disqualify him from total disability payments. Id.

Here, as in McOsker, Northwestern Mutual initially approved Stengrim's application for total disability benefits based on its understanding that Stengrim's principal job duty involved technical servicing of copy machines.  In addition, Northwestern Mutual never made a determination in the normal course of its benefits assessment that Stengrim was not totally disabled; rather, Northwestern Mutual discontinued Stengrim's benefits due to his misrepresentations about his mental health history on the Policy application.  These facts weigh against a finding that Stengrim is not totally disabled as a matter of law.  Id. Accordingly, while the previous payment of benefits is not ultimately dispositive of the issue, the Court determines that, on the record before it, there are genuine issues of

18

material fact which preclude summary judgment with respect to whether Stengrim is totally disabled under the Policy.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendant Northwestern Mutual's Motion for Summary Judgment (Doc. No. 39) is **DENIED**.

Dated: October 6, 2005                              s/Richard H. Kyle
                                                                             RICHARD H. KYLE
                                                                             United States District Judge